**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**NICHOLAS J. RANDALL and FAN FENG,**

      **Plaintiffs,**

v.                                                        **Case No:   6:17-cv-2103-Orl-31EJK**

**OFFPLAN MILLIONAIRE AG,
CAPINVEST LLC, and CARL DHIR,**

      **Defendants.**
_____/

**REPORT AND RECOMMENDATION**

This cause comes before the Court on Plaintiffs' Motions for Default Judgment ("the Motions"). (Docs. 110, 111, 112.) Plaintiffs seek entry of default judgment against Defendants Offplan Millionaire AG, Capinvest LLC, and Carl Dhir after they failed to respond to the Complaint. After reviewing the Motions and the Declarations of Plaintiff Randall (Docs. 110-1, 111-1, 112-1) submitted in support of same, I respectfully recommend that the Motions be granted in part and denied in part as to Offplan Millionaire AG and Capinvest LLC, and denied as to Carl Dhir.

**I.   BACKGROUND**

    **A. Procedural Posture**

On April 4, 2018, Plaintiffs, Nicholas J. Randall and Fan Feng, filed an Amended Complaint[1] ("Complaint") against eight Defendants for racketeering. (Doc. 17.) Plaintiffs alleged that the Defendants conspired to participate in an enterprise for the common purpose of engaging in racketeering activity, specifically wire and mail fraud, in the conveyance and maintenance of

---

[1] Plaintiffs instituted this action on December 7, 2017. (Doc. 1.)

real property located in the United States, with the majority of the properties located in Orange County, Florida. (*Id.*, ¶¶ 243–311.) Specifically, the Amended Complaint alleged four claims: (1) violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO") (Count I); (2) violation of the Florida RICO Act, Fla. Stat. § 895.03(2)–(3) (Count II); (3) conspiracy to commit violations of the RICO Act, 18 U.S.C. § 1962(d) (Count III); and (4) conspiracy to commit violations of the Florida RICO Act, Fla. Stat. § 895.03(4) (Count IV). (Doc. 17.)

Six of the defendants subsequently defaulted, and one was never served. Joachim Oliver Nedela, a German citizen residing in Switzerland, was the only Defendant to appear in the action, but the Court dismissed him for lack of personal jurisdiction. (Doc. 100.) Thereafter, Plaintiffs voluntarily dismissed Lucretia Doran (Doc. 106), Daniel J. Doran (Doc. 107), Crescent Real Estate Management, Inc. (Doc. 108), and Stephen Jordan-Quayle a/k/a Stephen Jordan (Doc. 109) from the case without prejudice. Plaintiffs filed the present Motions for default judgment against the only remaining Defendants: Offplan Millionaire AG d/b/a Prime Asset Investments Ltd. ("Prime Asset") (Doc. 110), Capinvest LLC ("Capinvest") (Doc. 111), and Carl Dhir a/k/a Carl Dear ("Dhir") (Doc. 112). The Motions are each accompanied by the supporting Declaration of Plaintiff Randall (Docs. 110-1, 111-1, 112-1.) No responses have been filed and the time to do so has expired.

### B. Factual Allegations Deemed Admitted as to Prime Asset, Capinvest, and Dhir

Plaintiff Randall is a businessman residing in the United Kingdom. (Doc. 17, ¶¶ 6, 25.) Randall's business is in purchasing, restoring, and selling distressed residential properties in the United Kingdom and Asia. (*Id.* ¶ 25.) Plaintiff Feng resides in China and was Randall's colleague, agent, and designee in connection with the real estate and management transactions at issue. (*Id.* ¶

7.) Defendant, Prime Asset, is a Swiss corporation that represented itself to Randall as a business that advised and assisted individuals with real estate investing. (*Id.* ¶¶ 8, 9). Prime Asset stated it had two U.S. offices, one in Orlando and one in Chicago. (*Id.* ¶ 10.) Capinvest shared the same address as Prime Asset's "USA Midwest Office," and the managing member of Capinvest was Prime Asset. (*Id.*) Carl Dhir, a resident of Spain, was an "investment strategist" for Prime Asset and worked at its headquarters in Switzerland. (*Id.* ¶ 14.) At issue here are 56 properties Randall purchased through Prime Asset and/or Capinvest (the "Subject Properties"). (*Id.* ¶ 20.)

Beginning in November or December 2012, Randall began seeking to invest in foreclosed and distressed U.S. realty. (*Id.* ¶ 27, 28.) Lacking expertise in U.S. customs and procedures with property, Randall sought out an agent to help him acquire the properties. (*Id.*) Randall learned of Prime Asset through an internet advertisement. (*Id.*) Prime Asset touted itself as an experienced property sourcing company for multinational investors like Randall. (*Id.* ¶¶ 29, 30.) After a period of due diligence, Randall filled out a contact form on Prime Asset's website. (*Id.* ¶ 33, 34.) Within a few days, Stephen Jordan-Quayle a/k/a Stephen Jordan ("Jordan"), who worked for Prime Asset, had a conversation with Randall about the services Prime Asset could provide. (*Id.* ¶ 35.)

Thereafter, Jordan and Randall entered into a sourcing agent relationship where Prime Asset would source U.S. properties, for a fee, and would then use Capinvest to bid on the properties. (*Id.* ¶ 36.) Randall decided to move forward on a single transaction to evaluate Prime Asset's services. (*Id.* ¶ 37.) On January 13, 2013, either Jordan or another Prime Asset employee, Elena Vachova, sent Randall a "Sourcing Agreement" and an invoice for an initial "Advance Source Fee" for Randall's first property, which Randall executed and paid by wire transfer to Prime Asset's bank account in Switzerland. (*Id.* ¶ 42.)

According to Plaintiffs, the fraud began immediately. In April 2013, Prime Asset recommended a single-family home for purchase in Detroit, Michigan, that was on the market for $62,000. (*Id.* ¶ 44.) Randall paid this amount in full by wire to Prime Asset's Swiss bank account. (*Id.* ¶ 44.) Subsequently, Dhir advised Randall regarding deeding of the property, and ultimately, Randall instructed Prime Asset to transfer title of the property to Feng. (*Id.* ¶ 47.) Unbeknownst to Plaintiffs, Capinvest had previously purchased the subject property for only $33,000 on April 2, 2013, and did not record the deed publicly until May 21, 2013, after Randall had purchased the property for $62,000. (*Id.* ¶ 50.) This repeated pattern of selling Randall properties Capinvest already owned continued over the course of several years with numerous properties. Prime Asset and Capinvest also failed to properly transfer title to Randall or Feng for 47 of the Subject Properties. (*Id.* ¶ 77.)

Moreover, sometime prior to Randall's first property purchase, Jordan advised Randall not to hire an independent attorney because it would be a waste of money to hire someone to review purchases of foreclosed property, a process that Jordan represented as having a standard procedure. (*Id.* ¶¶ 61–62.) In April 2013, Jordan introduced Randall to Dan Doran, a "specialized real estate attorney" who had worked with Prime Asset on a number of occasions. (*Id.* ¶ 62.) However, Dan Doran failed to mention to Randall that he was disbarred in New York in 2001 for tax fraud and was not licensed to practice law in any jurisdiction. (*Id.* ¶¶ 64, 65.) Without knowing this, Randall agreed to hire Dan Doran to handle the legal aspects of all his transactions with Prime Asset. (*Id.* ¶¶ 69.)

Randall also engaged Dan Doran's wife, Lucretia Doran, to manage his properties pursuant to a Management Agreement. (*Id.* ¶¶ 78–86.) However, Jordan, Dan Doran, Lucretia Doran, and Crescent Real Estate Management, Inc. ("Crescent") repeatedly misled Randall about Crescent's

lack of compliance with its obligations under the Management Agreement in an attempt to cover up its breaches while continuing to get more fees and to divert more of Randall's funds to themselves. (*Id.* ¶ 87.) For example, Dan Doran would tell Randall that Crescent needed money for refurbishment expenses, homeowners' association dues, and property taxes for the Subject Properties. (*Id.* ¶ 88.) Randall would then wire money to Crescent to take care of these expenses, but Crescent made no such payments. (*Id.* ¶ 89.) Crescent also maintained an Income Account for deposits for the Subject Properties, such as rental income. (*Id.* ¶ 90.) However, despite reporting that Randall's Income Account had a positive balance, Crescent never turned over any money to Randall or Feng.

In October 2013, the fraud moved to Florida. (*Id.* ¶ 131.) Jordan and Dan Doran told Randall about a multi-unit condominium development called Blossom Park, located in Orlando, Florida. (*Id.*) While Jordan and Dan Doran represented Blossom Park to be a high-yield investment, they failed to disclose to Randall that the property was a haven for drug use, guns, prostitution, and crime. (*Id.* ¶¶ 132–134.) Dan Doran recommended two units to Randall at the purchase price of $40,000 each. (*Id.* ¶¶ 138, 141.) Randall agreed to purchase the two units, directing Prime Asset to arrange for Capinvest to buy the properties. (*Id.* ¶¶ 139, 141.)

Unbeknownst to Randall, Capinvest had previously purchased the two units for $18,000 and $16,000. (*Id.* ¶¶ 140, 141.) Based on Jordan's and Dan Doran's recommendations, Randall went on to purchase another 27 properties at the Blossom Park condominium through December 2014. (*Id.* ¶¶ 144, 156.) However, none of the units were ever publicly conveyed to Randall or Feng; to date, Capinvest remains the owner of public record for those units. (*Id.* ¶ 160.)

Jordan made additional misrepresentations to Randall regarding another batch of condominiums, Magnolia Court, also located in Orlando. Based on these representations, Randall

directed Prime Asset to purchase six units. (*Id.* ¶¶169–171.) Once again, Defendants engaged in misrepresentations of price, property condition, payment of taxes, and rental incomes produced. (*Id.* ¶ 177.)

Near the end of 2014, Randall became concerned that Crescent was not providing him complete and accurate information regarding the management of his properties. (*Id.* ¶ 181.) To that end, Randall and Feng went to Orlando to tour Randall's properties. (*Id.* ¶ 184.) After touring Blossom Park, it was obvious the units were in poor condition and unoccupied. (*Id.* ¶¶ 186, 188.) In March 2015, Randall decided he would not make any more investments with Prime Asset and would more closely monitor the services performed by Crescent. (*Id.* ¶ 190.)

Eventually, in May 2016, Randall complained to Prime Asset, through Jordan, that Dan and Lucretia Doran and Crescent were unresponsive and were not properly performing their jobs as property managers. (*Id.* ¶ 199.) To that end, Jordan involved Dhir to respond to Randall's concerns. (*Id.* ¶ 200.) Jordan then told Randall that Dhir had found a new property management company for Randall's properties. (*Id.* ¶ 202.) On May 26, 2016, Randall met Jordan and Dhir in Madrid where Randall confronted them with his suspicions regarding the mismanagement of his investments, which Jordan and Dhir denied. (*Id.* ¶ 203.) At the end of the meeting, Randall requested Jordan and Dhir come to the U.S. with Randall to visit his properties and help resolve the issues. (*Id.* ¶ 206.) Dhir agreed to do so. (*Id.*)

However, Dhir never came to the U.S. (*Id.* ¶ 208.) Instead, Prime Asset sent another representative, Brian Diamond, who had very little knowledge of the Subject Properties. (*Id.* ¶ 209.) At Prime Asset's direction, Diamond went with Randall, Randall's attorney, and Randall's United-Kingdom-based real estate advisor to meet with Blossom Park's administrator. (*Id.* ¶ 211.) The administrator confirmed that the condominium has been deteriorating long before Prime Asset

recommended to Randall he invest there; he also confirmed that Lucretia Doran had been renting Blossom Park units by the hour for cash only, which she did not have Randall's authority to do. (*Id.* ¶¶ 211–213.)

In a June 2016 email, Dhir emailed Randall to deflect blame from Prime Asset onto Dan Doran. (*Id.* ¶ 221.) Dhir promised that Prime Asset would wire funds to Randall "to remedy the mess Dan has created." (*Id.*) Dhir also assured Randall the properties would all be deeded properly in Randall's name. (*Id.*) However, Randall never received reimbursement or compensation from any of the Prime Asset Defendants, including Prime Asset, Capinvest, Nedela, Jordan, and Dhir.

## II.   STANDARD

A district court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear. Fed. R. Civ. P. 55(b)(2). The mere entry of a default by the Clerk does not, in itself, warrant the Court's entering a default judgment. *See Tyco Fire & Sec. LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007). Rather, a defaulted defendant is only deemed to admit the plaintiff's well-pled allegations of fact. *Id.* "Thus, before entering a default *judgment* for damages, the district court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." *Id.* (emphasis in original).

"Once liability is established, the court turns to the issue of relief." *Enpat, Inc. v. Budnic,* 773 F. Supp. 2d 1311, 1313 (M.D. Fla. 2011). "Pursuant to Federal Rule of Civil Procedure 54(c), '[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings,' and a court may conduct hearings when it needs to determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other

matter." *Id.* (citing Fed. R. Civ. P. 55(b)(2).) Where all the essential evidence is of record, an evidentiary hearing on damages is not required. *SEC v. Smyth,* 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).

### III. DISCUSSION

#### A. Service of Process

As an initial matter, the Court finds that service of process was proper on all three Defendants. Prime Asset is a Swiss corporation with its principal office in Switzerland. (Doc. 17, ¶ 8.) Prime Asset was served pursuant to the Hague Convention on June 20, 2018. (Doc. 43.) Capinvest is an Illinois limited liability company with its principle office in Chicago. (Doc. 17, ¶ 11.) Capinvest was served through its registered agent on April 6, 2018. (Doc. 19.) Dhir is an individual who last resided in Spain and served as an employee, independent contractor, or agent of Prime Asset, working at Prime Asset's headquarters in Switzerland. (Doc. 17, ¶ 14.) Dhir was served through the Hague Convention in Switzerland as well. (Doc. 42.)

#### B. Jurisdiction

Plaintiffs have alleged causes of action arising under the federal RICO statutes, providing the Court with subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Additionally, the Court has supplemental jurisdiction over Plaintiffs' Florida RICO claims pursuant to 28 U.S.C. § 1367(a).

Plaintiffs allege that the Court has personal jurisdiction over Prime Asset because

> it has regularly conducted business within Orange County, Florida, for the purpose of perpetuating the RICO Enterprise, including advertising property investment services and properties for sale in Orlando, Florida; maintaining an office in Orlando; and authorizing and directing its wholly owned subsidiary to purchase, own, and sell 56 properties to the Plaintiffs. (ECF No. 17, ¶¶ 23(a)-(d), 24(b), 129-198; ECF No. 17, Ex. A, ¶¶ 4-10).

(Doc. 110 at 4.) Plaintiffs allege that the Court has personal jurisdiction over Capinvest because

"it has regularly conducted business within Orange County, Florida, for the purpose of perpetuating the RICO Enterprise, including the purchase, ownership, and sale of 56 properties to the Plaintiffs. (ECF No. 17, ¶¶ 23(c)-(e), 24(b), 137-198; ECF No. 17, Ex. A, 4-10)." (Doc. 111 at 4.) Finally, as to Dhir, Plaintiffs allege that the Court has personal jurisdiction over him because

> he has frequently advertised properties for sale located in Orlando, Florida and solicited Randall and other investors to use the assistance of Prime Asset and its U.S. subsidiary to purchase and manage real estate in Orlando, including advertising property investment services and properties for sale in Orlando, Florida; personally executing and delivering deeds, contracts, and other documents concerning these properties to agents in Florida; as well as playing an integral role in soliciting, authorizing, and directing the purchase, ownership, and sale of 56 properties to the Plaintiffs, and the following coverup of the fraudulent activities. (ECF No. 17, ¶¶ 23(c)-(d), 24(b), 151; 199-222; ECF No. 17, Ex. A, ¶¶ 4-10).

(Doc. 112 at 4.)

While Plaintiffs cite no legal authority for their propositions that the Court has personal jurisdiction over Prime Asset, Capinvest, and Dhir, the Court assumes that they make this assertion pursuant to Florida's long-arm statute, Fla. Stat. § 48.193. "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *See, e.g.*, *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274, (11th Cir. 2009). Under Florida's long-arm statute, a defendant may be subject to specific jurisdiction (if the action arises out of the defendant's contacts with Florida) or general jurisdiction (if the defendant engages in substantial and not isolated activity in Florida). *See* Fla. Stat. § 48.193(1) & (2).

The undersigned finds that Plaintiffs have alleged enough to establish specific jurisdiction as to Prime Asset and Capinvest. Capinvest purchased real property in Florida on Randall's behalf, as directed by Prime Asset, and Prime Asset maintained an office in Florida. Fla. Stat. § 48.193(1)(a)(1), (3). Dhir, however, is a closer call. Plaintiffs do not point the Court to any specific

provision of Florida's long-arm statute that secures personal jurisdiction over Dhir. And an independent review of Florida's long-arm statute does not reveal an adequate basis. Moreover, the only other specific allegation in the Complaint regarding personal jurisdiction is in paragraph 22, which alleges that, "This Court has personal jurisdiction over Defendants because they conspired or have been willing participants in an enterprise engaged in a pattern of racketeering activity in violation of RICO, through acts indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1342 (wire fraud)." (Doc. 17, ¶ 22.) That allegation is insufficient on its face to establish personal jurisdiction. Having failed to provide the undersigned with enough information to determine that the Court has personal jurisdiction over Dhir, I respectfully recommend that the Court find that it lacks personal jurisdiction over Dhir as pleaded. However, for the purpose of this Report, I will still analyze Dhir's involvement in the alleged RICO enterprise in the event the Court finds otherwise.

### C. Liability

#### a. Federal RICO (Count I)

Section 1962(c) of the RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Civil RICO claims are "essentially a certain breed of fraud claims," and must therefore "be pled with the increased level of specificity" required by Rule 9 of the Federal Rules of Civil Procedure. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007); *see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997).

"To state a RICO claim, a plaintiff must plead (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce." *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002.)

The statute defines an "enterprise" as any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (2020). The Supreme Court has noted that this definition is intentionally broad. *Boyle v. United States*, 556 U.S. 938, 944 (2009). An enterprise is proven "'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *Id.* at 945 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

An enterprise has been adequately pleaded here. The Complaint states that Prime Asset is a foreign corporation that directly and indirectly purchased real property, on behalf of investors, while failing to disclose material facts to those investors, such as price, ownership, condition, and liabilities (e.g., owed taxes) of the subject property, for profit. (Doc. 17, ¶¶ 250, 251(a), 252(b)–(d), 253(a)–(c), 254(a)–(c).) Capinvest is an Illinois corporation, wholly owned and established by Prime Asset, to perpetuate its fraud by secretly purchasing foreclosed properties cheaply and then "flipping" them to the investors at a significantly higher price for its own profit. (*Id.* ¶¶ 250(b), (e), 251(a)–(g), 252(c), (d), 253(b), 254(b), 255(a)–(c).) Dhir is an employee, independent contractor, or agent of Prime Asset who arranged and coordinated the purchase of real property and deflected Randall's concerns about the operation of Prime Asset's business. (*Id.* ¶ 250(d).) Dhir signed the "Sourcing Instruction" on behalf of Prime Asset provided to Randall in August 2014 and also

communicated with Randall on behalf of Prime Asset in person on May 26, 2017, as well as by telephone and by email many times. (*Id.* ¶¶ 250(d), 252(h), 253.) The Complaint establishes that Prime Asset, Capinvest, and Dhir, along with the dismissed Defendants, worked together for the common purpose of profiting from Randall by inducing him to purchase properties in the United States at heavily inflated prices and to send Defendants additional money allegedly to renovate and maintain the properties, which they did not do. (*Id.* ¶¶ 246, 259.)

Additionally, the Complaint sets forth facts sufficient to establish that Defendants engaged in what the statute defines as a "pattern of racketeering activity." Such a "pattern" consists of the commission of any of the criminal offenses, commonly referred to as "predicate acts," identified in 18 U.S.C. § 1961(1)—including mail fraud (§ 1341) and wire fraud (§ 1343), as alleged here. *Ironworkers Local Union No. 68 v. AstraZeneca Pharms., L.P.*, 634 F.3d 1352, 1358 n.13 (11th Cir. 2010). To successfully allege a pattern of racketeering activity, Plaintiffs "must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

Plaintiffs have pleaded more than two racketeering predicates that are related. "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Id.* (internal quotation marks omitted). The defendant need not have personally committed each element of mail or wire fraud to be found liable for it. *U.S. v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007). Rather, "a defendant may be convicted of mail [or wire] fraud without personally committing each and every element . . .so long as the defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails [or wires] for the purpose of exacting the same scheme." *Id.*

(footnote omitted). Here, the enterprise engaged in repeated acts of wire and mail fraud. Defendants, including Prime Asset, Capinvest, and Dhir, regularly used mail, email, telephone calls, and wire transfers to materially misrepresent the properties being purchased, including their value, ownership, and the ultimate transfer of title. (Doc. 17, ¶¶ 264–273.)

Further, Plaintiffs have alleged sufficient facts to demonstrate the continuity required to establish a "pattern." The RICO statute targets "*ongoing* criminal activity, rather than sporadic, isolated criminal acts." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (emphasis in original). Thus, the Eleventh Circuit "requires proof of something beyond the two predicate acts themselves," and a party seeking to recover must allege "the threat of *continuing* racketeering activity." *Id.* at 1265 (internal quotation marks omitted) (emphasis in original).

There is no bright-line rule that defines exactly how long or over what period of time the predicate acts must occur in order for them to be considered "substantial," *id.* at 1266. However, decisions from other courts provide guidance on the temporal requirements of the "substantial" inquiry, suggesting that predicate acts occurring over a period of two years or more is sufficient for purposes of establishing continuity under RICO. *See, e.g., Water Int'l Network, U.S.A., Inc. v. East*, 892 F. Supp. 1477, 1482 (M.D. Fla. 1995) (finding closed-ended continuity when predicate acts of repeated wire and mail fraud occurred over a twenty-two month period); *Colonial Penn Ins. Co. v. Value Rent-A-Car Inc.*, 814 F. Supp. 1084, 1094 (S.D. Fla. 1992) (finding closed-ended continuity when predicate acts of mail and wire fraud occurred over at least a two year period). As the Complaint makes clear, the predicate acts of mail and wire fraud occurred over a three-and-a-half year period, from approximately December 2012 through August 2016. (Doc. 17, ¶¶ 264–273.) Thus, Plaintiffs have alleged facts sufficient to establish the continuity requirements

necessary to prevail on a RICO claim.

Accordingly, Plaintiffs have sufficiently stated a cause of action for violation of federal RICO.

### D. Federal RICO Conspiracy (Count III)

"Section 1962(d) of the RICO statutes makes it illegal for anyone to conspire to violate one of the substantive provisions of RICO, including § 1962(c)." *Am. Dental*, 605 F.3d at 1293 (citing 18 U.S.C. § 1962(d)). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Id.* (internal quotation marks omitted). Evidence of a RICO agreement may be supported by direct evidence or may be inferred from the participants' conduct. *Id.*

Here, it can be inferred from Prime Asset and Capinvest's conduct that they agreed to participate in the objective of the conspiracy to defraud Randall, or alternatively, that they agreed to commit two predicate acts. The Complaint details Prime Asset's multiple recommendations to Randall that he purchase a property that Capinvest already owned and had purchased at a much cheaper price. This arrangement required an agreement between the two entities to execute the fraud and also amounted to an agreement to commit two predicate acts.

As to Dhir, Plaintiffs allege that Dhir agreed to the objective of the conspiracy and took several predicate acts in its furtherance, including in his regular communications with the Plaintiffs, preparing of documents to create and expand the RICO Enterprise, and active steps to cover up and continue the fraud even after Randall confronted Dhir with his allegations at the meeting in Madrid. Accordingly, Plaintiffs have sufficiently stated a cause of action for civil conspiracy to violate Federal RICO as to Prime Asset , Capinvest, and Dhir.

### E. Florida RICO (Count II) and Florida RICO Conspiracy (Count IV)

Plaintiffs have additionally brought two counts for violation of Florida RICO (Counts II and IV). It is well established in both the Eleventh Circuit and courts in this District that "[c]laims under Florida's RICO act are analyzed in the same manner as claims under the federal RICO act. Consequently, the pleading requirements for federal and Florida RICO claims are analogous." *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F.Supp.2d 1355, 1364 (M.D. Fla. 2007) (internal citation omitted) (citing *Jackson*, 372 F.3d at 1263–1264). Accordingly, based on the well-pleaded allegations with respect to Counts I and III set forth above, Defendants are equally liable for violation of Florida RICO, and default judgment should be entered on Counts II and IV of the Amended Complaint.

### F. Actual Damages

Having established liability under the Federal and Florida RICO laws, the Court finds that Randall is entitled to treble damages. The Federal RICO statues provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964(c); *Ray v. Spirit Airlines, Inc*, 836 F. 3d 1340, 1348 (11th Cir. 2016). Additionally, courts have found it appropriate to impose joint and several liability in RICO actions because "all defendants participate in the enterprise" for such violations. *Lawrence Holdings, Inc. v. ASA Int'l, Ltd.*, No. 8:14-cv-1862-T-33EAJ, 2014 WL 5502464, at *17 (M.D. Fla. Oct. 30, 2014) (internal quotation marks omitted). Finally, awarding post-judgment interest is appropriate. 28 U.S.C. § 1961.

Randall has submitted declarations setting forth the amount of his actual damages. (Docs. 110-1, 111-1, 112-1). This includes the losses he incurred from the undisclosed property price

markups, which make up the bulk of his damages, in addition to the unpaid property taxes, the purchase price of lost properties, additional sourcing fees sometimes charged separately from a property's purchase price, and post-purchase wire payments, all amounting to $1,361,230.07. (*E.g.*, Doc. 110-1, ¶ 17; Doc. 110-2 at 6–16.)

However, Feng has not submitted any evidence to the Court in the form of a declaration or otherwise as to how she is entitled to damages pursuant to § 1964(c), which requires injury to business or property. Because of this, I recommend that only Plaintiff Randall be entitled to treble damages. Therefore, I find that Randall is entitled to judgment in the amount of $4,083.690.21, with post-judgment interest.

## IV.   RECOMMEDATION

Upon consideration of the foregoing, I **RESPECTFULLY RECOMMEND** that

(a) Plaintiffs' Motions for Default Judgment (Docs. 110, 111) be **GRANTED IN PART and DENIED IN PART** as follows:

   a. That the Motions be **DENIED** to the extent that Plaintiff Feng has not established damages under 18 U.S.C. § 1964(c).

   b. That the Motions be **GRANTED** such that the Court enter a default final judgment on Counts I through IV of the Amended Complaint providing:

   i. Defendants, Offplan Millionaire AG and Capinvest LLC, pay damages in the amount of $4,083.690.21, representing an award of three times the amount of actual damages, pursuant to 18 U.S.C. § 1964(c), in favor of Plaintiff Nicholas Randall;

   ii. Offplan Millionaire AG and Capinvest LLC pay interest on this award pursuant to 28 U.S.C. § 1961; and

> > iii. Plaintiff Feng take nothing.
>
> (b) Plaintiffs' Motion for Default Judgment (Doc. 112) be **DENIED** for failure to establish personal jurisdiction over Carl Dhir, and that the Amended Complaint as to Dhir be **DISMISSED WITHOUT PREJUDICE**; and
>
> (c) Thereafter, that the Clerk of Court be **DIRECTED** to close the case.

## NOTICE TO PARTIES

A party has **fourteen days** from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on April 21, 2020.

	 	 	 	 	 	 	 	 _____
	 	 	 	 	 	 	 	 EMBRY J. KIDD
	 	 	 	 	 	 	 	 UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Parties